CONSOLIDATED FREIGHTWAYS CORPORATION OF DELAWARE, a Delaware Corporation, Plaintiff,

v.

Thomas D. LARSON, individually, and in his capacity as Secretary of Transportation, Department of Transportation, Commonwealth of Pennsylvania; Jay Cochran, Jr., individually, and in his capacity as Commissioner of the Pennsylvania State Police; Leroy S. Zimmerman, individually, and in his capacity as Attorney General of the Commonwealth of Pennsylvania; Richard Thornburgh, individually, and in his capacity as Governor of the Commonwealth of Pennsylvania, Defendants.

Civ. No. 84–0222.

United States District Court, M.D. Pennsylvania.

Nov. 19, 1986.

Jack M. Stover, Shearer, Mette & Woodside, Harrisburg, Pa., and John Duncan Varda, DeWitt, Sundby, Huggett & Schumacher, S.C., Madison, Wis., for plaintiff.

John J. Knorr, Deputy Atty. Gen., Chief Litigation Section, Harrisburg, Pa., for defendants.

## MEMORANDUM

HERMAN, District Judge.

## I. INTRODUCTION

This case is a preemption case. The plaintiff is Consolidated Freightways Corporation (Consolidated or Consolidated Freight). Consolidated operates truck tractor-semitrailer-trailer combinations (twins or doubles) and truck tractor-semitrailer combinations (single twins) in which the semitrailer has a length less than twenty-eight and one-half feet, a width of 102 inches, and which usually operates as part of a twin on highways in Pennsylvania. Plaintiff also operates some truck tractor-semitrailer combinations (semis) in which the semitrailer has a length of forty-four feet. Plaintiff contends that the Surface Transportation Assistance Act of 1982 (STAA) preempts certain provisions of the Pennsylvania Vehicle Code, 75 Pa.C.S.A. §§ 4908, 4921, and 4923 governing access by twins, single twins, and large semis to and from a national network of highways established by the federal act. Plaintiff seeks as its remedy declaratory judgment and an injunction against enforcing the allegedly preempted portions of state law.[1]

The record in this case consists of the transcript of a non-jury trial held January 8, 1986 through January 14, 1986, the exhibits introduced at that hearing, deposition transcripts submitted by agreement of the parties, and designated portions of the record of a prior proceeding in which the instant plaintiff challenged Pennsylvania's proscription of twin trailer combination vehicles on all of its roadways. *See* Document No. 9, dated September 5, 1984 in this action, and *Consolidated Freightways Corporation of Delaware v. Thomas D. Larson*, C.A. No. 81–1230.

The parties have submitted their post-trial briefs and requests for findings of fact and conclusions of law, and the matter is now ripe for decision.

## II. DISCUSSION

Plaintiff, Consolidated Freight, advances two main arguments in support of its claim that the Surface Transportation Assistance Act preempts Pennsylvania's statutory and administrative scheme providing access to the national network. First, Consolidated asserts that Pennsylvania's access laws are facially violative of the federal law in that the federal law does not allow review of access routes *prior* to their use by STAA vehicles, whereas Pennsylvania *denies* use of any non-network route by STAA vehicles unless and until that route is approved by the Pennsylvania Department of Transportation and any local municipalities that may have jurisdiction over the route. Further, Consolidated argues, the Pennsylvania laws are facially violative of the STAA because they essentially deny all access to facilities off the national network for food, fuel, rest and repair, and because they effectively prohibit access by single twin trailers and household goods movers to points of loading and unloading.

Second, Consolidated argues that Pennsylvania's access scheme *as applied* violates the STAA because of the delays in access route approvals, the arbitrary denials, and the applications of erroneous standards that have proved to be the norm during the several years since institution of the approval procedures.

The Commonwealth, however, urges that the STAA does allow for state review and approval of access routes prior to their use

---

1. In its complaint, plaintiff also alleged that Pennsylvania statutes and regulations violated the Fourteenth Amendment of the United States Constitution and the Commerce Clause, in addition to its preemption or Supremacy Clause claim. In its post-trial brief and in its opening and closing arguments at trial, however, the plaintiff abandoned its Commerce Clause and Fourteenth Amendment claims, pursuing instead the preemption claim alone.

by STAA vehicles, and that this approval process, while slow and cumbersome in the past, has become streamlined and acceptable under the STAA with the promulgation of several new regulatory procedures and policies.

### A. *The Supremacy Clause Analysis*

The Supremacy Clause of the United States Constitution, and the preemption doctrine that arises therefrom, prohibit any state from enacting and enforcing any laws contrary to the laws of the United States. A federal law can preempt a state law either expressly or impliedly. In the instant case, it is clear that the Surface Transportation Assistance Act expressly preempts any conflicting state laws: "No State may enact or enforce any law denying reasonable access ..." 49 U.S.C. § 2312(a). Because Congress has expressed a "clear and manifest" intention to preempt conflicting state law, *Jones v. Rath Packing Co.*, 430 U.S. 519, 525, 97 S.Ct. 1305, 1309, 51 L.Ed.2d 604 (1977), our only inquiry in this case is whether the Pennsylvania laws governing access to the national network of highways established by the Surface Transportation Assistance Act conflict with that Act. In conducting this inquiry, we must consider not only the state and federal laws as written, but also these laws as they are interpreted and applied. *Id.* at 526, 97 S.Ct. at 1310.

### B. *The Federal Statute*

The Surface Transportation Assistance Act of 1982 was passed to alleviate the burden on interstate commerce created by individual states such as Pennsylvania prohibiting twin trailers and other large vehicles on interstate highways within their borders. The Act created national vehicle size limitations of 102 inches in width, forty-eight feet in length for a semi-trailer, and twenty-eight feet in length for twin trailers (vehicles of these dimensions will be termed STAA vehicles). The Act also created a national network of Interstate Highways and federal-aid primary roads designated by the United States Secretary of Transportation on which these wider and longer STAA vehicles could run. In order to insure access for these vehicles to terminals and facilities for food, fuel, rest, and repair, and, for household goods carriers, to points of loading or unloading, the Surface Transportation Assistance Act also prohibited states from interfering with "reasonable access" between the network and these facilities.

In subsequent amendments, Congress provided a mechanism for exempting certain segments of the interstate highway system from the national network if the Secretary of the Department of Transportation determines that they are not capable of safely accomodating the larger STAA vehicles. Congress also approved inclusion of segments of highways in the national network that have lanes less than twelve feet in width, and made explicit that tractors pulling a single 102 inch wide twin trailer should also be afforded reasonable access to and from points of loading and unloading. *See* 49 U.S.C. § 2312; Tandem Truck Safety Act of 1984, P.L. 98–554, 98 Stat. 2829.[2]

---

**2.** The full text of the "reasonable access" provision as it reads today is as follows:

(a) No State may enact or enforce any law denying reasonable access to commercial motor vehicles subject to this chapter between (1) the Interstate and Defense Highway System (other than any segment thereof which is exempted under section 2311(i) or 2316(e) of this title) and any other qualifying Federal-aid Primary System highways, as designated by the Secretary, and (2) terminals, facilities for food, fuel, repairs, and rest, and points of loading and unloading for household goods carriers and for any truck tractor-semitrailer combination in

which the semitrailer has a length not to exceed 28½ feet and which generally operates as part of a vehicle combination described in section 2311(c) of this title.

(b) Nothing in this section shall be construed as preventing any State or local government from imposing any reasonable restriction, based on safety considerations, on any truck tractor-semitrailer combination in which the semitrailer has a length not to exceed 28½ feet and which generally operates as part of a vehicle combination described in section 2311(c) of this title.

49 U.S.C. § 2312.

At issue in this litigation is the intent of Congress in providing that "no State may enact or enforce any law denying reasonable access" to the national network. Plaintiff, Consolidated, asserts, as outlined above, that this provision prohibits state review and approval of access routes before allowing STAA vehicles to travel on these routes, and that states are precluded from denying access based on safety concerns. This interpretation of the statute is based on a narrow and restrictive reading of the provision "no state may enact or enforce any law denying reasonable access." Consolidated's argument goes as follows: Pennsylvania denies the use of routes not a part of the national network to STAA vehicles until application for a particular route has been made and the route has been approved by the Commonwealth and various local entities (*see* section II–C, *infra* ). Eventually, most applications for access routes are approved. These access routes that are approved must, because of the approval, be reasonable. Therefore, argues Consolidated, during the application process while the routes were closed to STAA vehicles, the Commonwealth was denying *reasonable access* to STAA vehicles in violation of federal law.

■ While this interpretation, although awkward, might be plausible had Congress enacted the reasonable access provision without comment, Congress has indicated a contrary intent in the legislative histories of both the original Surface Transportation Assistance Act and the later Tandem Truck Safety Act of 1984. In the House Committee Report on the Surface Transportation Assistance Act of 1982, H.R.Rep. No. 555, 97th Cong., 2d Sess., *reprinted in* 1982 U.S.Code Cong. & Ad.News 3639, the Committee noted that the provision requiring the states to permit STAA vehicles reasonable access to and from the national network "is not intended to preempt a State's reasonable exercise of its police powers with respect to safeguarding public safety on roads within the area of its jurisdiction." *Id.,* 1982 U.S.Code Cong. & Ad.News at 3662. This comment indicates that although states may not deny *reasonable*

access, Congress intended that an ingredient in determining reasonableness may be a determination of whether or not use of a particular route by STAA vehicles would endanger the public safety. In other words, Congress clearly intended that a state or local government might deny access to and from the national network over a route that cannot safely be used by STAA vehicles.

■ Further, the Congressional intent that states be allowed to reasonably exercise their police powers in the interest of safety, that they be allowed to deny certain access routes for safety reasons, also indicates that in appropriate circumstances a state may reasonably exercise its police power in the interest of safety to deny access pending a safety review of a proposed access route. To be consistent with the statute and Congress's intent in passing the statute, however, such prior review and approval must be reasonable, i.e., it must be a "reasonable exercise of [the state's] police powers with respect to safeguarding public safety on roads within the area of its jurisdiction." 1982 U.S.Code Cong. & Ad.News at 3662.

That Congress did intend that states have control over the approval or denial of reasonable access routes to the extent of their police power interest in providing for the safety of their citizens is confirmed by the legislative history of the amendments to the Surface Transportation Assistance Act. In the Senate Committee Report of the Tandem Truck Safety Act of 1984, S.Rep. No. 505, 98th Cong., 2d Sess., *reprinted in* 1984 U.S.Code Cong. & Ad. News 4769, the Committee expressly acknowledged its awareness that the Secretary of Transportation "has allowed the State[s] to establish individual provisions for access to the national network, rather than establish a Federal definition of reasonable access." *Id.,* 1984 U.S.Code Cong. & Ad.News at 4772. Despite their awareness that the resulting "nonuniformity of access has become a considerable burden for trucking companies," *id.,* Congress did

nothing to change the reasonable access provisions of the law to provide for a uniform, national definition of reasonable access. Congress knew full well at the time it passed the Tandem Truck Safety Act that some states "permit very little deviation from the national network," *id.*, yet it made no provisions for more liberal access over non-network routes.

It is an accepted rule of statutory construction that "[w]hen a Congress that re-enacts a statute voices its approval of an administrative or other interpretation thereof, Congress is treated as having adopted that interpretation." *United States v. Board of Commissioners*, 435 U.S. 110, 134, 98 S.Ct. 965, 980, 55 L.Ed.2d 148 (1978). Although Congress did not, strictly speaking, re-enact the Surface Transportation Assistance Act, it did amend the Act with full knowledge of the interpretation given it by both the Secretary of Transportation and several states. Absence of any change to the "reasonable access" language under these circumstances can therefore be taken to indicate that Congress, in fact, intended the interpretation that states be allowed to make their own determinations of reasonable access.

In sum, these two pieces of legislative history, taken together with the language of the Act itself, indicate that Congress forbade states from denying *reasonable* access, but left it up to the states themselves to determine what is reasonable. Congress evidently intended that states be allowed to exercise their police powers to safeguard the safety of the public by denying as *unreasonable* access routes to and from the national network that cannot be safely traversed by STAA vehicles. The states' power to deny access is tempered, however, by the caveats that *reasonable* access *must* be available, and that states may only exercise their police powers reasonably and in the interest of public safety. Essentially, Congress has authorized a sliding scale test for the availability of an access route: the greater the risk to the safety of the public posed by the use of a route by an STAA vehicle, the more leeway the state has to deny or even temporarily

deny the use of that route pursuant to the reasonable exercise of its police powers.

## C. *The State Access Scheme*

Pennsylvania's approach to exercising its police powers in relation to the Congressional mandate that it not deny reasonable access has gradually evolved over the years since the Surface Transportation Assistance Act was first enacted into law. Pennsylvania now has a conglomeration of statutes, regulations, and formal and informal policies that guide the use of this power.

In 1983, after the Surface Transportation Assistance Act was passed, the Pennsylvania legislature passed an act in an attempt to bring Pennsylvania law into conformity with the new federal law. *See* Act of July 7, 1983, P.L. 32, No. 19, 75 Pa.C.S.A. § 4908. This relatively new statute provides that twin trailer vehicles and the longer semi-trailer vehicles authorized by the federal Act may only be driven on the national network created by STAA. It further provides that these STAA vehicles may have access off the national network only to terminals and facilities for food, fuel, rest, and repair that are within two-tenths of a mile of the nearest ramp or intersection leading to a national network highway, and then only if they are located on highways having lanes at least twelve feet wide. This restrictive provision is softened somewhat by a "cluster" rule which reads:

> [w]here one or more terminals or facilities for food, fuel, repair or rest along a highway having lanes at least 12 feet wide are in close proximity to a terminal or facility which is within two-tenths of a mile of the designated network, all of such terminals and facilities shall be deemed to be within two-tenths of a mile of the designated network.

75 P.C.S.A. § 4908(c). The statute also includes a provision for expanded access to terminals farther away than two-tenths of a mile or to terminals on highways with lanes less than twelve feet wide that "can

safely and reasonably be accessed using highways approved under subsection (d)." 75 Pa.C.S.A. § 4908(a)(2)(ii).

Subsection (d) of the statute sets out a route approval process whereby trucking companies can apply for approval of access routes between the national network and terminals that are not automatically accessible by virtue of the two-tenths of a mile provisions. This procedure requires that trucking companies seek approval of expanded access routes prior to running STAA vehicles on them from one of three government bodies:

> Approval of a route under subsection (a)(2)(ii) or (b)(2) shall be obtained from the:
>
> (1) City in the case of any highway in a city.
>
> (2) Department in the case of a State highway not in a city, except that the department will, upon request, delegate authority to approve routes under this subsection to a municipality which has been delegated authority to issue permits in accordance with section 420 of the act of June 1, 1945 (P.L. 1242, No. 428), known as the State Highway Law.
>
> (3) Municipality in the case of a local highway not in a city.

75 Pa.C.S.A. § 4908(d).

Access for household goods carriers to and from points of loading and unloading is also provided in the Pennsylvania statute, but the provisions for STAA semi-trailers (i.e., longer trailers) and STAA twin combinations differ. A semi-trailer carrying household goods "may be driven between the designated network and a point of loading or unloading which can safely and reasonably be accessed." 75 Pa.C.S.A. § 4908(b). No prior approval of the route is mandated for these STAA maximum length single trailer combinations. Twin trailer combinations, however, according to the statute, may only run between the national network and points of loading or

unloading "which can safely and reasonably be accessed using highways approved under subsection (d) for the particular movement." 75 Pa.C.S.A. § 4908(b)(2). In other words, twin-trailer combinations carrying household goods can only run on routes previously approved pursuant to the process outlined above.

Access for single twin combinations 102 inches in width is severely restricted by the statute. Section 4908 provides access from and to the national network for "combinations authorized by section 4904(e) ... to have two trailers," and for long semis. Section 4921 of the Vehicle Code, however, limits the width of all vehicles on the state's roadways to 96 inches *unless* they are operating as provided in § 4908. *See* 75 Pa.C.S.A. § 4921(a). A vehicle operating as provided in § 4908 may have a width of up to 102 inches. Section 4908 does not provide access to tractors pulling a single twin trailer, however, because it only speaks in terms of combinations having two trailers and long semis. Therefore, by operation of these two sections together, 102 inch single twin trailer combinations are statutorily denied access from and to the national network.[3]

Pennsylvania has not amended the above-outlined statutory scheme since Congress passed the amendments to the STAA contained in the Tandem Truck Safety Act of 1984. The Pennsylvania Department of Transportation has, however, promulgated regulations and adopted informal policies and interpretations in an effort to conform Pennsylvania's access system to the requirements of the federal law.

Chief, and first, among these informal policies and interpretations is a document known as the Sims Memorandum (Exhibits D–200 and P–2020 at 1). This memorandum was written and circulated within the Department of Transportation shortly after passage of Pennsylvania's statutory access scheme. For several years, it was the only

---

**3.** An informal policy of the Department at one time allowed single 102 inch twin trailer combinations to apply for and travel expanded access routes along with the other STAA vehicles. That policy has now changed and single 102 inch twins are informally permitted free access to points of loading and unloading.

document outlining the application and approval procedure for expanded access routes within the Commonwealth.

Attachment 5 to the Sims Memo, entitled "Pennsylvania's Legislated Approach for Implementing Federal Truck Size and Weight Requirements," interprets the statute's procedures for expanded access route approval. The memo provides that, rather than submitting applications to each government entity involved in the review process, as implied in the statute, the owner/operator of a motor carrier or a terminal may submit its application for an expanded access route to the Pennsylvania Department of Transportation. The Department then coordinates the access route review process, transmitting the application to any local government entities involved in the approval process.

The Memo also lists characteristics of 102 inch wide vehicles, vehicle combinations with two trailers, and vehicle combinations over sixty feet long, and lists safety concerns that should be considered in reviewing proposed access routes. The Memo advises that,

1. In general, the Department believes that 102 inch wide vehicle combinations can be permitted to operate on the majority of the State highway system.

and,

2. If single trailer combination trucks comparable to the WB–50 design vehicle are presently operating on the route under consideration, without substantial safety or operating problems, twin trailer combinations can be expected to operate in a similar manner.

It also cautions that long single trailer semis exhibit a greater tendency to encroach on the shoulder, sidewalk, or adjacent lanes when executing a short radius turn or curve, that this off-tracking tendency is minimized in combinations using shorter twin trailers, and that twin trailers, however, pose a greater rollover risk at higher speeds during steering maneuvers.

Finally, the Sims Memorandum interprets the Pennsylvania access statute as providing that access routes approved without restriction for use by one carrier may be used for access to and from the national network by all carriers. Routes may, however, be approved with restrictions. For example, a route, according to the Sims Memo, may be "approved for use by vehicles 102 inches in width only; or approved for vehicle combinations with two trailers only; or approved for single combinations over 60 feet in length." Sims Memo, D–200 at 3. The Memo also stresses that review and approval of routes is for the purpose of determining whether or not the route requested can *safely* and *reasonably* accommodate vehicle combinations with two trailers, vehicle combinations over 60 feet in length with a single trailer, or vehicles 102 inches in width. A route can be approved for all of these types of vehicles and combinations (i.e., without restrictions) and for only certain of the types of vehicles indicated above. If the route cannot be approved, the request must be denied. Sims Memo at 3 (emphasis supplied).

After the Tandem Truck Safety Act was passed in 1984, the Pennsylvania Department of Transportation adopted a few other informal policies in an effort to conform Pennsylvania's access route procedures to federal law. Among these informal policies was a waiver of the already existent informal policy of requiring advance route approval for single 102–inch wide twin combinations traveling to and from points of loading and unloading, *see* plaintiff's exhibit 2020 at 241–245, and a general policy of non-enforcement by the department pending resolution of applications for expanded access.

Finally, after several years of operating without any formal description or regulation of the route approval process, the Department of Transportation promulgated and published a set of formal rules. 15 Pa. Bulletin No. 52, December 28, 1985, 4586–4588 (67 Pa.Code Ch. 209). These rules attempt to impose time limits on the vari-

ous governmental entities that must approve or deny applications for expanded access. An application for an access route must be acted on by the relevant governmental entity within thirty days of receipt of the application. If the governmental body does not approve or disapprove of the proposed route within thirty days, the application will be deemed approved and expanded access will be granted. In the case of a route that requires the approval of both the Department of Transportation and a local municipality, the thirty day review period for the municipality shall commence upon receipt of the application by the municipality. Following the municipality's approval or denial, or the running of the 30 days, whichever comes first, the Department's thirty day review period begins to run. The whole process is not allowed to take longer than ninety days without the consent of the applicant.

In addition to the institution of time limitations for the review of an application, and automatic approvals should the time limitations be exceeded, the new rules provide that denials or restricted approvals of applications must be accompanied by written explanations of the reasons for the denial or restricted approval.

This last set of formal regulations governing the expanded access route application process was not promulgated until the eve of trial of this matter. Consequently, there is no testimony in the record as to the efficacy of these regulations. Plaintiff has argued persuasively, however, that these regulations, while sufficient to bind the Department of Transportation, cannot and do not legally govern the municipalities entrusted by the statute with the authority to review and approve or deny applications to use certain local routes.

The new expanded access regulations were adopted, according to the Commonwealth, pursuant to the Department of Transportation's authority under 75 Pa.C.S.A. § 6103 and 75 Pa.C.S.A. § 4908. Section 4908 is the statutory section governing access between the national network and terminals and facilities off that network. Section 6103 provides that the department has the authority to promulgate "consistent with and in furtherance of this title, rules and regulations in accordance with which the *department* shall carry out its responsibilities and duties under this title." 75 Pa.C.S.A. § 6103(a) (emphasis supplied). Under § 4908, however, the department has authority to approve *only* those *state* highways that are "not in a city, except that the department will, upon request, delegate authority to approve routes under this subsection to a municipality which has been delegated authority to issue permits in accordance with section 420 of the act of June 1, 1945 (P.L. 1242, No. 428), known as the State Highway Law." 75 Pa.C.S.A. § 4908(d)(2). Cities have sole jurisdiction over any highways within their borders; permit-authority municipalities may request and will be granted sole jurisdiction over any highways within their borders; and all municipalities have sole jurisdiction over local highways not in any city. Under the terms of § 6103, the department's regulations can only guide the *department* in carrying out its responsibilities and duties. Therefore, we find that the new regulations containing the time limitations and automatic approval provision can only govern the department's review of highways under its jurisdiction. Despite the language of the rules, a city or other municipality cannot, under Pennsylvania's statutory law, be deemed to approve any route that it does not act upon, nor can it be required by regulation to state reasons for any denials or restricted approvals.[4]

---

**4.** *See also* 75 Pa.C.S.A. § 6109(a), which reads, in part, as follows:

(a) Enumeration of police powers.—The provisions of this title shall not be deemed to prevent the department on State-designated highways and *local authorities on streets or highways within their physical boundaries from the reasonable exercise of their police*

*powers.* The following are presumed to be reasonable exercises of police power.

\* \* \* \* \* \*

(7) Prohibiting or restricting the use of highways at particular places or by particular classes of vehicles whenever the highway or portion of the highway may be seriously dam-

In sum, Pennsylvania's access route scheme is a conglomerate of sometimes contradictory, sometimes confusing, and sometimes unenforceable statutory provisions, rules, and formal and informal policies. The absence of specific statutory provisions governing access for single twin trailer combinations, and the resulting complete denial of access for 102 inch single twin trailer combinations to and from the national network is contradicted by the department's informal policy of allowing single twins to travel freely to and from points of loading and unloading. The Sims Memorandum is the only document containing standards for approval or denial of access routes, and is the only document that authorizes making a single access route application to the department of transportation, even for access routes that require the approval of municipalities. This single application procedure at least stretches the meaning of the statutory provisions on access route approval. And finally, the recently adopted regulations governing access route approvals, and even the older Sims Memorandum, while laudable in their intent, are, by the terms of the statute, unenforceable against any reviewing body except the department itself.

### D. The Conflict between State and Federal Law

Plaintiff, Consolidated Freight, claims that both the Pennsylvania statutory scheme providing for access to and from the national network and the *actual* access route approval process, including all the formal and informal policies and interpretations described above, are violative of the federal statute. Because Pennsylvania's statute essentially has three separate provisions that purport to provide reasonable access to and from the national network, we will address Consolidated's claims as to each of these three provisions separately.

#### 1. Access to Facilities for Food, Fuel, Rest, and Repair

The first of the three provisions, outlined in detail above, declares that twin trailer

aged by the use or the movement of the vehicles would constitute a safety hazard.

vehicles and longer semitrailer vehicles may have access from the national network to terminals or facilities for food, fuel, rest, and repair for two-tenths of a mile over highways having lanes at least twelve feet wide. Consolidated Freight argues that this two-tenths of a mile, twelve foot lane limitation is not reasonable access both because such limitations are not reasonable given the intent of Congress in providing for reasonable access, and because most highways that intersect with national network highways have lane widths of less than twelve feet, and most facilities are located beyond two-tenths of a mile from the national network highway.

#### a. Concern for Safety Along Access Routes

Congress, in passing the Surface Transportation Assistance Act and its subsequent amendments, forbade the states from denying reasonable access. Although Congress has essentially left it to the states to determine a definition of reasonable, it has provided some indication of the parameters of reasonableness. As more fully discussed above in section II–B, Congress has indicated that one ingredient of reasonableness is safety. *See* H.R.Rep. No. 555, 97th Cong.2d Sess., *reprinted in* 1982 U.S.Code Cong. & Ad.News 3639, 3662. The reasonableness of the two-tenths of a mile, twelve foot lane restrictions must therefore, in the first instance, be evaluated with an eye to the safety interests protected by these restrictions.

The record in this case indicates that the safety concerns raised by the use of STAA vehicles are somewhat different than those raised by the use of other large commercial vehicles. The most influential factor that determines the safety of any particular route for both types of vehicles, is, however, exposure, or number of miles travelled. N.T. 981–982 (6/16/82). All other factors being equal, the shortest route is the safest.

(Emphasis supplied).

Defendant argues vehemently that the longer length of STAA vehicles poses a safety concern on two lane highways in that it takes longer to pass or be passed by a longer vehicle, therefore the passing vehicle is exposed to oncoming traffic for a longer time. The risk posed by this additional exposure to oncoming traffic is minimal, however, because at 55 miles per hour a vehicle attempting a passing maneuver would require only about one additional second to pass a 67.9 foot combination vehicle travelling at fifty miles per hour compared to a sixty foot combination vehicle (currently allowed on all Pennsylvania highways) travelling at the same rate of speed. N.T. 4:142 (1/13/86). If the passing vehicle were to accelerate to 60 miles per hour, the additional time required to pass the longer vehicle would only be one-half of one second. *Id.;* Plaintiff's exhibit 2014 at 11.

The Commonwealth also argues, and we find, that there is a difference in safety concerns among STAA vehicles themselves. In general, twin trailer combinations are superior to semi-trailer combinations in executing low speed tight curves or turns at intersections, Ervin deposition at 13–16; Plaintiff's exhibit 2014 at 3–10. There is less chance that twin combinations will encroach into other lanes of traffic or onto curbs and sidewalks. On the other hand, the semi-trailer is more stable and less susceptible to roll-over in sudden, sharp emergency or obstacle-avoidance maneuvers at higher speeds. N.T. 4:146–147 (1/13/86); N.T. 972–973, 1002 (6/16/82). Although widening the width of a double trailer to 102 inches from 96 inches, has the effect of dramatically increasing stability and decreasing the frequency of roll-over accidents, this dramatic betterment in performance only results if the axle and springs or "running gear" is also widened. Ervin deposition at 24–32. If a 102 inch "box" is placed on 96 inch running gear, the stability of a double trailer combination is reduced. *Id.* at 41–42. Testimony from Consolidated's witnesses indicates that approximately 60% of its current fleet of twin trailers being operated remains at 96

inches. Furthermore, when the Canadian government increased its maximum width limitation from 96 inches to 102 inches, 90% of the trailers were operated with 102 inch bases on 96 inch running gear. Ervin deposition exhibit #2 at 25. The safety of operating double trailers on particular routes must therefore depend both on the size and configuration of the double trailers involved, on the likelihood of double-trailer combinations suddenly encountering obstacles that must be avoided, and on the availability of maneuvering room along the route for the execution of such avoidance maneuvers (i.e., size and quality of shoulders).

█ Finally, the Commonwealth argues that the greater width of STAA vehicles also poses some safety concerns, particularly on highways with narrow lane widths. Plaintiff's expert, Dr. William D. Glauz, himself expressed concern over having a 102–inch (8½ foot) wide vehicle travelling over an extended section of roadway having lanes only nine feet wide. N.T. 4:136 (1/13/86). We agree that a wide vehicle on a narrow roadway poses the danger that the wider vehicle will encroach into on-coming traffic lanes, or that it will drop its right-side wheels onto a lowered or soft shoulder, thereby hindering the safe operation of the vehicle. Congress recognized these dangers before passing the Tandem Truck Safety Act of 1984:

> While a combination of factors such as lane width, sight distance, horizontal curvature, shoulder width, and length and severity of grades will determine whether a road segment can safely accomodate 102–inch wide trucks, the Committee expects that a large portion of the final nationwide route system designated by the Secretary will consist of highways with lanes of 12–foot width.

S.Rep. No. 505 at 4783. In sum, we hold that, because there are safety concerns involved with operating the large STAA vehicles on local roads, Pennsylvania does have a legitimate interest in regulating the use of these roads as access routes to and from national network highways. Con-

gress itself recognized this interest. Yet, the mere existence of safety concerns does not, by itself, mean that Pennsylvania has in its current access scheme, legitimately restricted access to facilities for food, fuel, rest and repair.

### b. *Concern for Availability of Access Routes*

Although Congress has clearly recognized that safety is of major significance in determining the reasonable access to food, fuel, rest, and repair, and we have found that the use of STAA vehicles present legitimate safety concerns, Congress has also recognized that availability of these facilities is an important ingredient in determining the reasonableness of access. While Pennsylvania restricts access to twelve-foot lanes, Congress has recognized that highways with lane widths of less than twelve feet could be safely used by larger, wider vehicles, and intended that they be so used. In discussing the amendments to section 416 of the Surface Transportation Assistance Act that authorize the Secretary of Transportation to designate as part of the national network portions of federal-aid highways with lane widths less than twelve feet, the Senate Committee noted:

> The Committee recognizes that if section 416 were interpreted to require that only 12 foot wide lane mileage could be designated, it would be impossible for an 102–inch truck effectively to use the primary system in many States ... Congress did not intend such an interpretation of the statute. In fact, the language of existing section 416(a) cannot be taken as a legislative determination that 102–inch vehicles are never appropriate on lanes not "designed" to be 12 feet in width or, for that matter, on lanes actually of less than 12 feet in width. Such a determination would be unreasonable in light of: (1) the free operation of 102–inch vehicles in many States without respect to lane width; approximately one-half of the States have adopted legislation that permits 102–inch wide vehicles either on all roads or on all primary system routes in the State; (2) the na-

tionwide current operation of both intercity and transit buses at 102–inches; and (3) *the STAA's own requirement that the States permit access for the wider vehicles to terminals and facilities for food and fuel.*

*Id.* at 4782 (emphasis supplied).

The last reference in the quoted portion of the Committee report to the reasonable access provisions of the STAA indicates that Congress intended "reasonable access" to include highways that were not built to the standards of the national network, including highways with lane widths of less than twelve feet. While the committee recognizes that sub-standard highways may not be as safe for STAA vehicles to travel, implicit in the mandatory access requirement is the recognition that availability of facilities to truck drivers for food, fuel, rest and repair is just as much a safety concern as the configuration of the roads over which they travel. The determination of whether reasonable access is being provided to facilities for food, fuel, rest, and repair, therefore, must include consideration not only of the safety characteristics of a particular route or highway, but also the availability of those facilities at regular intervals along the national network.

### c. *The Pennsylvania System*

■ Pennsylvania's statutory blanket restriction of access to such facilities to two-tenths of a mile over highways with lanes of twelve feet or more does not take regular availability into account. Indeed, testimony and documentary evidence at the non-jury trial indicate that, under the existing statutory provisions, out of 137 vendors of maintenance and repair service in Pennsylvania, approved for use by Consolidated Freightways drivers, only eleven or 8% are within two-tenths of a mile of a designated route. *See* Plaintiff's exhibit 2013. Further, along Interstate 80, only five out of thirty-seven exits enter onto a highway having lane widths of twelve feet or more, and only two exits out of those five have facilities for food, fuel, rest, or repair with-

in two-tenths of a mile of the exit ramp. N.T. 4:24–25 (1/13/86) and plaintiff's exhibit 2028. Thus, under the Pennsylvania statutory provisions, only two facilities serve an approximately 300 mile stretch of highway, and these facilities are approximately four hours apart.[5] Taking into consideration availability as a factor in determining reasonableness, and Congress's indication that sub-standard roads may be acceptable for use as access roads, we find that Pennsylvania, by statutorily restricting access to facilities for food, fuel, rest, and repair to two-tenths of a mile on highways with at least twelve foot lane widths, has illegally denied reasonable access to these facilities.

### 2. Access to Terminals

The Pennsylvania statutory scheme provides the same two-tenths of a mile access to terminals as it does to facilities for food, fuel, rest, and repair, but it also provides an application procedure for expanded access. *See* Section II–C, *supra.* Because, as we determined above, review of a proposed expanded access route to or from a terminal prior to permitting its use by STAA vehicles *may* be a reasonable exercise of a state's police power, the statutory

provision for such prior review is not necessarily contrary to federal law. In fact, given the poor condition of many of the state's roads, and the fact that many of these roads were originally designed, built, and located to serve purely local transportation needs,[6] it is conceivable that there are many situations in which the risk to the safety of the public posed by the use of a proposed route by an STAA vehicle would amply justify prior review and temporary denial of use of the route.

The manner in which the statutory provisions on access route approval actually operate to deny access to many concededly reasonable routes for long periods of time, and sometimes permanently for no reason at all, is, however, contrary to federal law. Evidence at trial demonstrates that most access routes applied for are, eventually, approved. N.T. 4:83 (11/13/86). In fact, even the Pennsylvania Department of Transportation believes that 102 inch wide vehicles and double trailer vehicles can be operated on most of the highways within the state without substantial safety or operating problems. *See* Defendants' exhibit 200 at 4. Nevertheless, statistics show that, on average, it has taken Pennsylvania 257 days to respond to a request

---

**5.** The Commonwealth claims that there are many more than two accessible facilities along I–80. The Commonwealth's figures are based on a survey performed by Department of Transportation employees in 1985 in preparation for the trial of this matter. *See* Exhibit D–206. The survey indicated that many of the exits along I–80 opened onto highways with lanes twelve feet or more in width. Plaintiff's own survey of intersecting highways, however, indicates that only five exits open onto highways of sufficient width to satisfy the Pennsylvania statute. We find that the discrepancy between the two surveys is the result of the manner in which lane widths were measured. The Commonwealth instructed its employees to measure lane widths *only* at the point where the exit ramp intersected the local highway. The Commonwealth's witness, Mr. Hudzina, admitted that lane widths on intersecting highways vary along the length of the highway, and it is common knowledge born of observation that intersecting highways tend to have wider lanes for a few feet on either side of an entrance or exit ramp of a major interstate highway. N.T. 5:64–66 (1/14/86). Consolidated Freight's surveyors, however, mea-

sured at more than one point along the two-tenths of a mile access stretch, especially if there appeared to be a variance in the lane widths. N.T. 2:82–83. Because the statute specifies that lane widths must be at *least* twelve feet wide, we believe the measuring techniques employed by plaintiff are the more accurate and therefore find in accordance with plaintiff's survey.

**6.** Evidence in the record of this case and the 1981 case (see footnote 2, *supra*) demonstrates that there is cause to be concerned over the safety of operating STAA vehicles (which for the most part are wider and longer than other vehicles) over many of Pennsylvania's state and local highways. Pennsylvania's topography is mountainous and hilly, necessitating steep grades and hairpin turns in many smaller, older roadways. Nearly 100% of Pennsylvania's two-lane highway system is undivided, and virtually all of the two-lane highways have lane widths of less than 12 feet, while 66% have lane widths of 9 feet or less. *See* Stipulated facts contained in volume II of the parties' combined pre-trial brief from case number 81–1230.

for approval of a route. *See* Plaintiff's exhibit 2019. Only on rare occasions has route approval taken less than 60 days, and some requests have been pending for over 730 days. Of the requests for which the data on disposition time is available, 74.1% have taken more than 3 months, 61.04% more than 6 months, 38.51% more than 8 months, and 30.86% more than a year. Over 5% have taken more than two years and are currently pending. *Id.* These statistics are appalling, given the high rate of approvals once an application is acted on.

Further, a look at the causes of delay in acting on applications demonstrates that the longer delays are experienced on applications that, by statute, require municipal approval of even a small section of the route. Plaintiff's exhibit 2019. Generally, at least one local approval is required for terminal access. Often, the segment of the route requiring local approval is the last segment into the terminal for which no alternative routes are usually available. *See* Deposition of Walter Bagley at 30–32; N.T. 3:44–45 (1/10/86); Deposition of Michael S. Gillespie at 77; Deposition of George Harley at 21; N.T. 4:14 (1/13/86). Rather than being an indication that locally-maintained roads tend to be less safe for travel by STAA vehicles, and therefore justify more study and investigation prior to approval, these delays appear, from the evidence, simply to be the result of the slow movement of local approval machinery, or the result of conscious decisions not to respond to requests for approval.

■ Additionally, local denials of segments of access routes appear to be guided by no articulated standards and often by misguided notions of the safety and operating characteristics of STAA vehicles. In keeping with our determination that a state may, under the Surface Transportation Assistance Act, exercise its police powers reasonably to review an access route and subsequently to deny access in the interest of public safety, we also hold that a denial of an access route *must* be for safety reasons and *must* be related to a safety or operating characteristic of the STAA vehicle in

relation to the proposed route. Otherwise, the denial amounts to a denial of reasonable access in contravention of the federal statute.

The evidence in the record shows that municipalities often have no reason at all for denying a particular route. Municipalities have frequently denied routes that local Department of Transportation districts would have approved had the routes been under the department's jurisdiction. *See* Deposition of Terry Carlson at 26–27, 35; Deposition of Donald Fein at 20, 26, 29–34; N.T. 3:44, 46–47, 55–56 (1/10/86); Deposition of Gillespie at 25, 69. Some municipalities have a policy of automatically denying or refusing to respond to all applications for access routes. Most notably among these is the city of Philadelphia. Deposition of Bagley at 14–15, 45; Deposition of Jack W. Boorse at 20–21; Deposition of Carlson at 25, 28–30, 33–34, 35–37; Deposition of Fein at 7–10, 20–21, 27–28; N.T. 3:56–57, 59 (1/10/86); N.T. 4:57–58; Plaintiff's exhibit 2020.

Other municipalities are completely ignorant of the characteristics of STAA vehicles. Kost deposition at 54. They consequently base denials on factors that are not relevant simply to STAA vehicles, but rather to large commercial vehicles that already run on the proposed route, or to all vehicles generally, or on factors that are irrelevant to safety altogether. For instance, one township believed that the trucks presently using the requested route into the terminal, principally non-STAA semis, were tearing up the township road and the township board wanted the trucking firm to rebuild the road for them. Consequently, the township denied the requested access route for twin trailers in an attempt to force the company to make the repairs. No safety reason or operating characteristic unique to twins was given for the denial. Bagley deposition at 46–50. Other townships have cited intersection maneuverability as a reason for denying access to twin trailers when, in reality, the turning radius and therefore maneuverability of a twin trailer combination vehicle is

actually more favorable than in a semi. Carlson deposition at 53–54; N.T. 3:48–49 (1/10/86); Kost deposition at 12–13, 46; Fein deposition at 36; Ervin deposition at 13–16; N.T. 2:93–97 (1/9/86). Still other municipalities base denials on such irrelevant and improper factors as the amount of traffic over a particular route,[7] general accident rates, roadwear, economic benefits to the community, public attitudes toward large trucks, and other political considerations. Bagley deposition at 28–30; Fein deposition at 24; Galati deposition at 58; Gillespie deposition at 46; Wood deposition at 25; Plaintiff's exhibit 2020 at 69, 95, 117, 89–93, 125–127; N.T. 3:48 (1/10/86); N.T. 4:61–62 (1/13/86).

Denials based on such factors that are irrelevant to safety, and denial of access pending lengthy review of an application for access amount to denial of reasonable access in violation of the Surface Transportation Assistance Act. Although we cannot specify what amount of time a reviewing body may take under the Act to review an application for access and still be acting within their reasonable police powers, we do rule that an average denial pending review of 257 days, or even a denial of ninety days as proposed by the Department's new regulations, is not reasonable. While we hold that the reasonableness of a denial pending review, and the length of that denial, is governed by the severity of risk posed by the proposed use of a particular route by STAA vehicles, we cannot conceive of any situation that would warrant a review period of three months. Even a route that needs careful study for safety reasons can be driven by a traffic safety engineer or other official in a few days. A demonstration run by an applicant's STAA vehicle can also be arranged in a few weeks. Similarly, a meeting with company officials to determine the operating characteristics of the proposed vehicle could be arranged in the same few weeks. We therefore hold that Pennsylvania's expanded access route approval procedures, insofar as they deny access for an unreasonable amount of time pending review of applications, and insofar as they lead to denials of access for reasons other than the safety or operating characteristics of the particular vehicles in question in relation to the particular route in question, are in violation of the Surface Transportation Assistance Act.

The Commonwealth argues that these two defects of lengthy denials pending review and arbitrary denials by municipalities have already been eliminated by the December 1985 regulations and by other informal policies and procedures within the department. As we discussed in section II–C, *supra*, we find that the department's authority to bind municipalities by regulation is severely limited under the statute. We therefore do not believe that these regulations have improved or will improve Pennsylvania's overall record on lengthy denials pending review or on arbitrary denials. Plaintiff's claims are therefore not moot, and our holding that the access route approval scheme violates federal law in these two respects stands.

3. *Access to Points of Loading and Unloading*

The Pennsylvania statutory scheme provides for access to points of loading and unloading for household goods carriers using both STAA semis and double trailer combinations, however prior approval of routes is required for double trailer combinations. Access for single twins is nowhere provided for, but the Department of Transportation's informal policy is to allow them to run freely over Pennsylvania highways without prior approval.

Although the same standards for determining the reasonableness of an access route and the reasonableness of a state's exercise of police power applies to access to points of loading and unloading, another

---

**7.** Amount of traffic is one of the factors used by authorities to deny routes when, in fact, the use of twin trailers could ameliorate a truck-traffic problem. Consolidated's explanation of "via" operations convinces us that the use of twin trailers can, in particular circumstances, reduce miles travelled by 49.1%, 27%, or even 81.1%. *See* Plaintiff's exhibit 2008.

factor becomes important for these determinations. Points of loading and unloading, unlike locations of terminals, necessarily change with great frequency and are dependent upon the locations of the customers serviced by trucking companies. A carrier of general commodity freight, such as Consolidated, transports small shipments of freight for many different customers. This type of carrier serves small and large shippers, manufacturing locations, commercial establishments (e.g. pharmacy and office supply stores), schools, hospitals, and even private residences. There is often little or no advance notice as to a customer's location, and pick-up and delivery locations change daily. N.T. 1:33–135 (1/8/86); Plaintiff's exhibit 2007. Similarly, household goods carriers transport goods mainly for residential customers who expect their furnishings to be picked up and moved from their residence to their new homes with no delays for route approval.

In these circumstances, the reasonableness of prior review as an exercise of police power is greatly reduced, especially where a carrier seeks to use single twins for its pick up and delivery operations. Congress itself recognized that the interests of safety were better served by allowing pick-ups and deliveries to be made in single twins rather than in full semis:

> Section 5 of the Tandem Truck Safety Act of 1984 therefore provides authority for safer and more efficient motor carrier operations in pickup and delivery service by assuring reasonable access to points of loading and unloading to a limited and clearly-defined class of commercial motor vehicles on a uniform national basis.

S.Rep. No. 505, 98th Cong., 2d Sess., *reprinted in* 1984 U.S.Code Cong. & Ad. News 4784.

■ In view of the frequency of route changes for household goods carriers and operators of single twins, then, we find that it is not a reasonable exercise of police power to require prior approval of routes used by these vehicles. Indeed, such a requirement would virtually mandate the use of non-STAA vehicles because of the frequency with which points of loading and unloading change, and would therefore effectively deny *all* access to points of loading and unloading for these vehicles, in serious violation of federal law.

Our holding that prior route approval for household goods carriers and single twins may not be required under federal law does *not,* however, prohibit states from exercising their reasonable police powers with respect to these vehicles in other ways. Indeed, Congress expressly provided that a state or local government could impose "reasonable restriction[s] based on safety considerations," on the operation of single twins. We hold only that prior review of access routes to and from points of loading and unloading is not a reasonable restriction.

## III. CONCLUSIONS OF LAW AND DECLARATORY RELIEF

In view of the above findings of fact and discussion, we make the following conclusions of law and grant the following declaratory relief:

1. Under the Surface Transportation Assistance Act, states may engage in prior review and approval of access routes between the national network and terminals and facilities for food, fuel, rest and repair, but only to the extent that the review is a reasonable exercise of the state's police powers with a view toward safeguarding public safety on roads within the area of the state's jurisdiction.

2. The greater the risk to the safety of the public posed by the use of a route by an STAA vehicle, the more leeway the state has to deny or temporarily deny the use of that route pursuant to the reasonable exercise of its police powers.

■ 3. A temporary denial of access pending review must be only for a reason-

able length of time, and reasonableness is governed by the severity of the risk to the safety of the public posed by the proposed use.

4. Pennsylvania's statutory blanket restriction of access to facilities for food, fuel, rest, and repair to two-tenths of a mile over highways with lanes of 12 feet or more effectively denies reasonable access to facilities for food, fuel, rest and repair.

5. Pennsylvania's expanded access route approval procedures for access to terminals denies reasonable access in violation of federal law to the extent that it denies access for an unreasonable amount of time pending review of route applications, and to the extent that it leads to denials of access for reasons other than the safety of the public.

6. To the extent that Pennsylvania requires prior route approval for household goods carriers operating STAA vehicles and for single twin trailer combinations, it denies reasonable access to and from points of loading and unloading in violation of federal law.

### ORDER

AND NOW, this 19th day of November, 1986, IT IS ORDERED and DECLARED that:

1. Pennsylvania's access route approval scheme violates and is preempted by federal law to the extent that it denies reasonable access between the national network of highways established by the Surface Transportation Assistance Act and terminals, facilities for food, fuel, rest and repair, and points of loading and unloading, in accordance with the terms of the accompanying memorandum.

2. Defendants are hereby permanently enjoined from further denial of reasonable access in accordance with the terms of the accompanying memorandum.

3. The Clerk of Court is directed to close the file.