**A.B.F. FREIGHT SYSTEM, INC., Plaintiff,**

v.

**Colonel Robert L. SUTHARD, Superintendent of Virginia State Police, Defendant.**

**Civ. A. No. 88–0018–R.**

United States District Court, E.D. Virginia, Richmond Division.

March 16, 1988.

F. William Kirby, Jr., Melvin R. Manning, Manning, Davis & Kirby, Richmond, Va., for plaintiff.

James Hayes, Jay Steele, Asst. Attys. Gen. of Virginia, Richmond, Va., for defendant.

## MEMORANDUM OPINION

RICHARD L. WILLIAMS, District Judge.

### INTRODUCTION

This case presents a challenge to the validity of Virginia's restriction on the local travel access allowed to single tractor-trailer units. The trailer units in question, referred to as single twins or "pup" trailers, measure 28' long by 102" (or 8 and ½') wide. They are typically used in tandem combinations, with two pup trailers connected together, for over-the-road hauling of customer freight. The pup trailers are also used in single trailer units for local freight deliveries and pickups. The dispute in this case centers over the access to local points of loading and unloading which these single pup trailers are guaranteed by federal law.

This case comes before the Court on the plaintiff's motion for a preliminary injunction, and the defendant's motion for summary judgment. ABF Freight System, Inc. (ABF) alleges that enforcement of Va.Code §§ 46.1–328, 46.1–328.1 violates federal law and unduly burdens interstate commerce. These Virginia statutes provide for restric-

tions on the use of 102" wide tractor trailers on the roads of the Commonwealth. Plaintiff contends that under federal law, 49 U.S.C. § 2312, its 28' long, 102" wide single "pup" trailers are guaranteed reasonable access to all points of loading and unloading in the state. ABF further claims that because the Virginia scheme of restrictions prevents this access, it is in direct conflict with the relevant federal statutes, and is thus invalid under the Commerce and Supremacy Clauses of the United States Constitution (Article I, section 8; and Article VI, clause 2).

This declaratory judgment action, filed under 42 U.S.C. § 1983, seeks a ruling that the Virginia scheme is invalid and a permanent injunction prohibiting future enforcement of the Virginia statutes. ABF also seeks to recover its costs and attorneys fees under § 1983.

Plaintiff alleges jurisdiction under 28 U.S.C. § 1337, which provides that district courts shall have original jurisdiction of any civil action arising under any federal statute "regulating commerce or protecting trade and commerce against restraints and monopolies."

This case is before the Court on cross-motions for summary judgment. While ABF has filed only a motion for a preliminary injunction, both ABF and the defendant have since represented to the Court their agreement that the case is now ripe for summary adjudication on the record as made. The Court will therefore treat ABF's motion for preliminary injunction as one for summary judgment on the merits.

As will be seen, this case arises out of certain undisputed facts; the controversy centers around the interpretation of those facts and their significance under federal law. The record in the case consists of certain exhibits and affidavits, and the in-court testimony of Mr. Linwood Butner, taken at the initial hearing on January 15, 1988.

### FACTUAL BACKGROUND

ABF Freight System, Inc., is an interstate common carrier claiming to operate under authority issued by the Interstate Commerce Commission. In its freight carrier business, it employs approximately 8,100 people nationally and 181 people in Virginia alone. During the fourth quarter of 1987, ABF delivered 18,882 shipments of less-than-truckload (LTL) freight to customers in Virginia, and picked up 18,040 shipments of LTL freight from Virginia customers. These figures do not include stops at ABF's nine terminals in the state. (Affidavit of J. Yarbrough).

Typically, freight is brought into Virginia on tandem units, which are truck tractors pulling two trailers, each measuring 28' long by 102" wide. At ABF's company terminals, the trailers are separated and the individual "pup" trailers are used for local pick-up and delivery operations. The single trailer makes its deliveries, some 15–25 a day, and then calls the local terminal for pick-up instructions. These pick-up requests are received right up to the hour before the truck is dispatched. As a result, the local terminal does not know in advance what the loading or unloading schedules will be. The particular shipments on the truck dictate the deliveries and the order in which they are made. In the same way, loading requests cannot be planned more than a few hours in advance of dispatching. Customers often call on very short notice and the company, in order to be competitive, needs to respond quickly.

Finally, because of these conditions, customer points of loading and unloading change frequently, even daily. Thus, the same truck and driver will not travel the same routes or to the same customers on any two given days. Because current customers call at unpredictable times, and because new customers are always calling, the order and timing of deliveries and pick-ups are constantly changing. (Affs. of J. Yarbrough, D. Fralin; D. Fralin Depo. at 22–24, 34–39, 42–49.)

ABF owns 7,570 trailers which measure 28' long by 102" wide ("pups"); 1630 trailers which are 28' long by 96" wide; and 682 trailers which are 45' long by 96" wide. These trailers are always moving between ABF's 292 terminals and its thousands of points of loading and unloading. The local

terminals do not have trailers permanently assigned to them; the same pup trailers used for local deliveries are also used in tandem units for over-the-road hauling (Affs. of D. Fralin, 1/15/88; P. Bentley).

This case arises from the arrest of driver James M. Hardin, who is a local ABF driver in the Wytheville, Virginia, area. On January 13, 1988 he was dispatched to make deliveries from a pup trailer which had come from Asheville, N.C. After his deliveries he made a pick-up in Dublin, Va., and proceeded to the terminal. Hardin was then dispatched to make a pick-up from Camcar, one of ABF's customers. While en route, at about 4:30 p.m., Hardin was arrested by a Virginia state trooper. The trooper issued Hardin a citation for violating Va.Code § 46.1–328, and advised Hardin that he was driving his pup trailer on a non-designated route. According to Hardin, the trooper also said that he was going to stop the Company from using 102″ wide trailers on non-designated routes, and that if he caught them again he was going to park them and make the Company get a permit to move them (Affs. of James Hardin, P. Bentley).

This incident caused ABF to spend an extra three man-hours of time in delivering the freight to Camcar. ABF claims that continued enforcement of the Virginia scheme will cause it untold irreparable harm that can only be prevented by an injunction. (Affs. of D. Fralin, P. Bentley.)

## DISCUSSION

### I. *The Federal Statutes*

In order to eliminate problems caused by inconsistent state regulation of highway use, Congress enacted the Surface Transportation Assistance Act of 1982 ("STAA"), 49 U.S.C. §§ 2301, *et seq.* This Act established uniform rules for the length, width, weight and configuration of commercial vehicles traveling on the Interstate System and segments of qualifying Federal–Aid Primary System highways ("National Network"). The latter federal roads were to be designated by the Secretary of Transportation as capable of safely accomodating such vehicles. 49 U.S.C. § 2311(c), (e).

Congress decided that vehicle sets which consisted of a truck tractor and two trailing units ("tandem") should be allowed on all National Network highways, free from state interference. It prevented local law from interfering with the federal scheme, by stating in 49 U.S.C. § 2311(c) that:

No state shall prohibit commercial motor vehicle combinations consisting of a truck tractor and two trailing units on any segment of the [National Network].

Further, Congress barred the states from prohibiting the use of commercial vehicles with the lengths approved by federal law. Section 2311(a) provides that "no state shall establish, maintain, or enforce any regulation of commerce which imposes a vehicle length limitation of less than 48 feet on the length of a semi-trailer unit . . ., and of less than 28 feet on the length of any semitrailer or trailer operating as [a tandem] on any segment of the [National Network]." 49 U.S.C. § 2311(a).

Likewise, Congress established a uniform width standard for National Network roads by enacting § 2316(a), which reads: "No State, .. shall establish, maintain, or enforce any regulation of commerce which imposes a vehicle width limitation of more or less than 102 inches on any segment of the [National Network]." 49 U.S.C. § 2316(a).

Finally, in recognition of the fact that authorized vehicles would need to leave the National Network to gain access to their terminals, and to facilities for food, fuel, rest and repair, as well as to make local pickups and deliveries of freight, Congress enacted § 2312(a) to provide that:

No State may enact or enforce any law denying reasonable access to commercial vehicles subject to this chapter, between (1) [the National Network], and (2) terminals, facilities for food, fuel, repairs, and rest, and points of loading and unloading *for household goods carriers* [emphasis supplied].

This was the original version of § 2312(a). While it allowed access to loading and unloading points for carriers of household goods, it apparently did not allow such

access for other authorized vehicles, including the single 102″ wide pup trailer units. Further, the original scheme allowed no exceptions to the ban on state limitations of length, or to the reasonable access provisions.

For these reasons and others, including a concern that the preemptive provisions of the STAA might have been too sweeping, Congress held hearings and enacted the Tandem Truck Safety Act of 1984 ("TTSA"). Congress amended § 2312(a) to guarantee that all single pup trailer units would have access to points of loading and unloading. Section 2312(a) now reads:

> No State may enact or enforce any law denying reasonable access to commercial motor vehicles subject to this chapter, between (1) the [National Network] (other than any segment thereof which is exempted under § 2311(i) or 2316(e) of this title) ..., and (2) terminals, facilities for food, fuel, repairs, and rest, and points of loading and unloading for household goods carriers *and for any truck tractor-semitrailer combination in which the semitrailer has a length not to exceed 28½ feet and which generally operates as part of a vehicle combi-*

*nation described in section 2311(c) of this title.*

49 U.S.C. § 2312(a) (emphasis supplied).

This provision now grants tandem operators the right to separate their two 28′ by 102″ wide trailers,[1] and to take the individual pup trailers to local points of loading and unloading. The access to terminals, and to food, fuel, repairs and rest, seems open to all STAA trailer units, regardless of the type of trailer.

Finally, the 1984 amendments added another important provision to the federal scheme. Subsection (b) of § 2312, enacted as part of the TTSA, now allows a limited role for state regulation of single pup trailer units. This subsection provides that:

> Nothing in this section shall be construed as preventing any State or local government from imposing any *reasonable restriction, based on safety considerations,* on any truck tractor—semitrailer combination [described in § 2311(c) of the Act.]

49 U.S.C. § 2312(b) (emphasis supplied). This language permits state regulation that is *reasonable* and based solely on *safety* considerations, so long as "reasonable access" remains available. Its impact on the

---

1. One potential problem arises from the fact that § 2312(a) does not expressly mention the *width* of the trailer units which are guaranteed such access to local points of loading and unloading. The scheme is confusing because both §§ 2311 and 2312 speak generally of vehicle length limitations. However, closer analysis shows that the trailers referred to in § 2312(a) are indeed the single 28′ long by 102″ wide pups.

Section 2312(a) extends this local access to trailers of "a length not to exceed 28½ feet and which generally operate as part of" a combination described in § 2311(c). Section 2311(c), in turn, provides that "no state shall prohibit commercial motor vehicle combinations consisting of a truck tractor and two trailing units on any segment of the National System...." Thus, the type of trailer is one whose length does not exceed 28½ feet and which is used in twin tandem units. But § 2311(c) does not expressly mention the trailer *width* which it contemplates. The obvious point of reference is § 2316(a), enacted as part of the original STAA. That section reads in pertinent part as follows: "no State ... shall establish, maintain, or enforce any regulation of commerce which imposes a vehicle width limitation of more *or less than 102 inches* on any segment of the [national network] ...." 49 U.S.C. § 2316(a).

This section leaves little doubt that the width of the vehicles mentioned in §§ 2311(c) and 2312(a) is the 102″ width mandated by § 2316(a). In any event, the legislative history of the law makes clear that the width intended was 102 inches. The bill which eventually became the 1984 Act was considered by the Senate Committee on Commerce, Science and Transportation. The Committee's Report commented on the provisions in question, by stating that: "Those combination vehicles described in section 411(c) [2311(c) ] are the *truck tractor, twin trailer combination vehicles* authorized for uniform interstate operations, *where the individual trailers are 28-feet in length ... and 102-inches in width.* Section 5 of S.2217 therefore provides that no State may deny reasonable access to points of loading and unloading for truck tractor single trailer units described in the STAA." S.Rep.No. 505, 98th Cong., 2d Sess., *reprinted in* 1984 U.S.Code & Ad.News 4769, at 4784 (emphasis added).

The rest of the Report goes on to say that the TTSA amendments included the "necessary language to assure access for local delivery operations for the individual, 28-foot by 102-inch, trailers." *Id.; accord Consolidated Freightways Corp. v. Larson,* 647 F.Supp. 1479, 1482, 1494 (M.D.Pa.1986).

validity of the Virginia statutes will be explored below.

## II. *The Virginia Access Scheme*

Virginia's regulation of local access for the single 102" wide pup trailers, and all other STAA vehicles, employs a system of prior review and approval. Having evaluated requests for access from the trucking industry, the Virginia Department of Transportation (VDOT) has designated nearly 2,000 miles of state and federal roads as approved access routes. Further additions to the access network are considered at the request of trucking companies. The Commonwealth now relies on a combination of statutes and informal regulatory policies to govern the request process and the selection of new access routes.

The statutes in Virginia dealing with truck-trailer dimensia have been amended several times since the STAA was enacted in 1982. However, in 1986 and apparently in response to the TTSA of 1984, the General Assembly rewrote its relevant laws. Section 46.1–328 was amended and new § 46.1–328.1 was added to the Code. As of today, the language of § 46.1–328(a) reads as follows:

> No vehicle, including any load thereon, but excluding the mirror required by § 46.1–289, shall exceed a total outside width as follows: (1) [repealed]; (2) passenger bus operated in an incorporated city or town when authorized . . .—102"; (2a) [repealed]; (2b) school buses—100" wide while in motion and 118" wide when stopped to pick up or discharge students; and (3) *other vehicles—96" with safety devices not to exceed 3" on each side of the vehicle, excluding rear view mirrors.*

Va.Code, § 46.1–328(a) (repl.vol. 1986) (emphasis supplied). The newly enacted § 46.1–328.1, effective March 7, 1986, reads as follows:

> No commercial vehicle shall exceed 102" in width when operating on any federal interstate and defense highway, or on any qualifying federal-aid primary highway designated by the State Highway and Transportation Board. The width limitation in this section shall not include rear view mirrors, turn signal lamps, handholds for cab entry and egress, splash suppressant devices and load-induced tire bulge. Safety devices, with the exception of rear view mirrors, shall not extend more than three inches on each side of the vehicle. *Such vehicles shall have reasonable access to terminals*, facilities for food, fuel, repairs and rest, *and points of loading and unloading of household goods as designated by the State Highway and Transportation Board.* For the purposes of this Section, a commercial vehicle is defined as a motor vehicle, trailer or semi-trailer designed or regularly used for carrying freight, merchandise, or more than ten passengers, whether loaded or empty, including buses, but not including vehicles used for van pools.

Va.Code, § 46.1–328.1 (repl.vol. 1986) (emphasis supplied). As ABF correctly points out, the emphasized portion of § 46.1–328.1 omits an important part of the language in 49 U.S.C. § 2312(a). Specifically, it ignores the part of § 2312(a) granting access to loading and unloading points for the 102" wide, single pup units; as far as Va.Code § 46.1–328.1 is concerned, such local access is provided only for carriers of "household goods."

Since § 46.1–328.1 fails to provide such access for 102" wide trailers, the applicable governing statute becomes § 46.1–328(a). As we have seen, § 46.1–328(a)(3) restricts commercial vehicle widths, other than buses, to a mere 96 inches. At first glance, therefore, the Virginia statutes are facially in conflict with the federal law enunciated in § 2312(a) of Title 49.

As a regulatory matter, the VDOT has adopted a definition of "reasonable access" to include any point within one-half mile of the National Network, and such other routes as are approved by the VDOT for STAA vehicle travel (Deft's Brief at 3). These other state roads comprise the "Virginia Access System," which includes selected state highways with lane widths of ten feet or more, and which generally meet the "national network criteria" set forth in

49 C.F.R. § 658.9 (1987). (Deft's Exs. 1–2, 4–5; Ex. A at 161.)

Procedurally, additions to the current access system are initiated only at the request of the trucking industry for access to a specific route (ABF's Ex. B, the "Hayes Letter"). The request is then analyzed by the VDOT's Highway and Traffic Safety Division, "to determine if the route can safely accommodate the larger vehicles" (Hayes Letter). This recommendation is then considered by the Commonwealth Transportation Commission (formerly the Highway and Transportation Board), which either approves or denies use of the route. (L. Butner testimony, Tr. 6–17.) Evidence in the record shows that VDOT has received a total of 598 requests for additional access routing, of which 360 requests have been approved and 238 rejected (Tr. 10; Deft's Ex. 3). This amounts to final approval of 60.2% of all access requests.

In summary, "under this analysis, 102″ pups would be allowed to go to points of loading and unloading off the national network *only after approval of an access route* unless the point of loading or unloading were within ½ mile of the national network" (Hayes Letter, emphasis supplied).

### III. *The Preemption Analysis*

In launching its attack on the Virginia statute, ABF bases its claim on the Commerce and Supremacy Clauses of the United States Constitution. The Supreme Court has already affirmed a decision which held that the STAA, in 49 U.S.C. §§ 2301 *et seq.*, is a statute validly enacted by Congress pursuant to its power under the Commerce Clause. *United States v. Connecticut*, 566 F.Supp. 571 (D.Conn.), *aff'd mem.* 742 F.2d 1443 (2d Cir.1983), *aff'd mem.* 465 U.S. 1014, 104 S.Ct. 1263, 79 L.Ed.2d 670 (1984).

The Supremacy Clause of the United States Constitution prohibits states from enacting or enforcing any laws contrary to the laws of the United States. The proper analysis for questions of federal preemption is well settled. Where Congress has clearly expressed its intention to preempt conflicting state law, the only inquiry is whether the state law in question actually conflicts with the federal law. *Jones v. Rath Packing Co.*, 430 U.S. 519, 526, 97 S.Ct. 1305, 1310, 51 L.Ed.2d 604 (1977). As the Supreme Court has recently explained:

> Even where Congress has not completely displaced state regulation in a specific area, state law is nullified to the extent that it actually conflicts with federal law. Such a conflict arises when "compliance with both federal and state regulations is a physical impossibility," ... or when state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress."

*Hillsborough County v. Automated Medical Labs., Inc.*, 471 U.S. 707, 713, 105 S.Ct. 2371, 2375, 85 L.Ed.2d 714 (1985) (citations omitted). In undertaking such an inquiry, the court must "consider the relationship between state and federal laws as they are interpreted and applied, not merely as they are written." *Jones v. Rath Packing*, 430 U.S. 519, 526, 97 S.Ct. 1305, 1310, 51 L.Ed. 2d 604 (1977); *see also De Canas v. Bica*, 424 U.S. 351, 363–65, 96 S.Ct. 933, 940–41, 47 L.Ed.2d 43 (1976); *Great Western United Corp. v. Kidwell*, 577 F.2d 1256, 1274–75 (5th Cir.1978).

As already noted, in the STAA Congress expressly intended to preempt all inconsistent state regulation: "No State may enact or enforce any law denying reasonable access to commercial motor vehicles subject to this chapter ..." 49 U.S.C. § 2312(a). Consequently, the only question to be resolved here is whether the Virginia statutes, as interpreted and applied, conflict with the provisions of the federal STAA and TTSA. *See Consolidated Freightways Corp. of Delaware v. Larson*, 647 F.Supp. 1479, 1482 (M.D.Pa.1986), *appeal granted* 827 F.2d 916 (3d Cir.1987).

■ As a limited exception to the "reasonable access" guarantee of 49 U.S.C. § 2312(a), § 2312(b) expressly allows the states to impose "reasonable restriction[s], based on safety considerations," on the local access mandated for single, 102″ wide pup trailer units. Accordingly, in order to be valid and to survive under the federal

statute, any state law restricting the local access of single pup trailers must satisfy these criteria: (1) the law may impose only *reasonable restrictions*, and the resulting access allowed must be *reasonable access* in fact; and (2) the state restrictions must be based solely on valid considerations of *safety* and not on any other, extraneous factors. 49 U.S.C. § 2312; *Consolidated Freightways v. Larson*, 647 F.Supp. 1479, 1483–84, 1492–94 (M.D.Pa.1986); *New York State Motor Truck Ass'n v. City of New York*, 654 F.Supp. 1521, 1539–40 (S.D.N.Y. 1987), *aff'd mem.* 833 F.2d 430 (2d Cir. 1987).

As the *Larson* court held in a similar context:

> The state's power to deny access is tempered, however, by the caveats that *reasonable* access *must* be available, and that states may only exercise their police powers reasonably and in the interest of public safety.

*Consolidated Freightways Corp. v. Larson*, 647 F.Supp. at 1484 (emphasis in original).

For the reasons indicated below, the Court concludes on the undisputed facts of this case that the Virginia scheme is invalid on both grounds: the restrictions themselves are not reasonable, nor do they result in allowing reasonable access; and the restrictions are not based solely on valid safety considerations. The Court therefore holds that the Virginia scheme of restricted access conflicts with the federal statute and is thus invalid under the Supremacy Clause.

A. *The Concern for Safety*

■ In challenging Virginia's access scheme, ABF first argues that the restrictions are not based only on safety concerns, and that the safety analysis upon which the VDOT relies is too dated and general in scope to justify the sweeping restrictions which the VDOT has adopted.

In response, the defendant contends that the VDOT does define reasonable access

solely by reference to safety considerations and that VDOT engingeers employ specific safety criteria in selecting access routes. For this claim, the defendant points to certain resolutions passed by the Commonwealth Transportation Commission; to the in-court testimony of Mr. Linwood Butner, a traffic engineer for the VDOT; and to a safety study completed in early 1985.

The Commonwealth Transportation Commission has passed a series of resolutions pursuant to its responsibility of designating Virginia's access routes (Deft's Exs. B–E). By means of such resolutions the Commission apparently establishes regulatory policy for itself and the VDOT, but this is not entirely clear from the record. In its resolution of March 17, 1983 the Commission adopted the initial STAA routes and the one-half mile allowance for access to terminals and to facilities for food, fuel, rest and repairs (Ex. B). On June 16, 1983, the Commission adopted an expanded system of access routes and approved eight specific resolutions concerning STAA routing which, in the words of the document, were all adopted "for the safe accomodation of larger trucks" (Ex. C). On March 15, 1984, in designating the new Virginia "access system," the Commission acknowledged that it approves access for all STAA vehicles to "points of origin or destination," rather than simply to terminals (Ex. D). Defendant reads this phrase to include local points of loading and unloading. *See* Brief at 5, 8. That resolution, along with the one passed on May 17, 1984 (Ex. E), recites that additional highways will be added to the access system "if such highways can safely accomodate the larger vehicles."

In sum, these resolutions do generally recite that access routes are selected on the basis of safety, yet they do so in only the most general and unspecific way. They do not identify the criteria to be used, nor do they require that the VDOT consider the specific safety characteristics of each type of STAA vehicle in question.[2] Equally im-

---

**2.** It is here worth noting that the relevant Virginia statutes, under which VDOT claims the authority to designate access routes, also fail to

specify *any* criteria to guide the discretion which VDOT and the Commission have in designating access routes. There is absolutely no

portant, the resolutions do not reveal how the access routes are actually selected in fact, nor whether the selections are justified by empirical safety data.

Defendant also relies on the in-court testimony of Linwood Butner, Assistant State Traffic Engineer with the VDOT. Mr. Butner testified that traffic safety is the only, or predominant, basis used to identify STAA access routes in Virginia (Tr. 6, 10–13, 23–24). He also stated that no route requests have been denied for any reasons other than failure to meet the safety requirements (Tr. 10). He did not specify how safety was determined nor what the "safety requirements" were.

Finally, the defendant relies heavily on a study entitled "Impact Analysis of Truck Length and Width Increases on Virginia Roads" (Jan. 17, 1985), included as Deft's Ex. A. This study was prepared by the VDOT for the General Assembly prior to its final amendments to the Virginia statutes (L. Butner testimony, Tr. 19–20). The 1985 study appears to be concerned primarily with safety issues, but it also discusses at length such topics as road damage, the costs to maintain and repair current roads, and the costs of building new highways. The study concludes that in 1983–84, Virginia experienced increases in both the numbers and severity of accidents involving tractor-trailer units. The study also inferred that as lane width decreased on two-lane highways, there was a corresponding increase in accidents involving tractor-trailers. (Deft's Ex. A at viii, 4–13.)

In order for Virginia to sufficiently demonstrate that its access restrictions on single pup trailers are based on proper safety considerations, the state must produce a thorough and definitive safety analysis which is narrowly tailored to the specific operating characteristics and safety risks of the 102″ wide, single pup trailer. *See Consolidated Freightways Corp. v. Larson*, 647 F.Supp. 1479, 1492 (M.D.Pa.1986). The *Larson* court put it very clearly when it stated that:

> statutory requirement that access decisions be based solely on safety considerations. As far as the statutes are concerned, the VDOT and local

a denial of an access route *must* be for safety reasons and *must* be related to a safety or operating characteristic of the STAA vehicle in relation to the proposed route. Otherwise, the denial amounts to a denial of reasonable access in contravention of the federal statute.

*Larson*, 647 F.Supp. at 1492 (emphasis in original).

In addition, the restrictions must be based only on safety considerations and not on such other, inappropriate factors as traffic convenience, road damage and costs of road maintenance. As the court held in *Larson*, any scheme of access-by-approval will be invalid and preempted under § 2312 "to the extent that it leads to denials of access for reasons other than the safety of the public." *Larson*, 647 F.Supp. at 1495; *see also New York State Motor Truck Ass'n v. New York City*, 654 F.Supp. 1521, 1539 (S.D.N.Y.1987), *aff'd mem.* 833 F.2d 430 (2d Cir.1987) (states may not impose "restrictions that are not based on safety"). Indeed, one reason the court struck down the Pennsylvania scheme in *Larson* was its finding that officials there relied on "such irrelevant and improper factors as the amount of traffic over a particular route, general accident rates, roadwear, economic benefits to the community, public attitudes toward large trucks, and other political considerations." *Id.*, 647 F.Supp. at 1493.

In short, safety must be the only basis for restricting access, and the safety reasons relied upon must be specific and directly related to the risks which single pup trailers pose when operating on the highways of the state. Examples of appropriate factors to consider include specific accident or fatality rates involving single pup trailer units.

The 1985 "Impact Analysis" study fails on both grounds. *First,* the study is addressed to the risks of all large tractor-trailers generally, and does not specifically consider or address the risks associated with single pup trailers. The study mentions trailer units longer than 56′ and wider

> authorities have unlimited discretion to grant or deny such access. *See* Va.Code §§ 46.1–328.1, 46.1–343.

than 96″, while it nowhere refers to the single trailers that are 102″ wide and only 28′ long. (*Cf.* L. Butner testimony, Tr. 34). Moreover, the 1985 study would not have focused on the effects of single 102″ wide pup trailers, since these were not in widespread use on the nation's highways until after the TTSA amendments took effect near the end of 1984. This study, published on January 17, 1985, cites data only from the years 1982, 1983 and 1984; thus the data for the analysis was compiled *before* the single pup trailer was even in general use in Virginia.[3]

*Second,* the 1985 study does not isolate the concern of safety alone, but also addresses such issues as road damage, cost of maintenance and repair, and the costs of constructing new highways (Ex. A at viii, 1, 6–7, 68–73). In addition, to show that the access restrictions are not confined only to safety concerns, ABF points to its Exhibit B, the so-called Hayes Letter—a letter to ABF's counsel from James F. Hayes, Assistant Attorney General for Virginia, dated June 25, 1986. The Hayes Letter does indicate that in fact the VDOT and Commission may rely on extraneous considerations, such as "convenience of traffic, rush hour demands, highway construction demands and the inability of the carrier to use alternative routes" (Hayes Letter, at 2). Indeed, the Letter goes on to assert that "an interpretation of 'reasonable access' to mean merely 'safe access' is a rather narrow reading of the statute in favor of the trucking industry" (*Id.*).

As a whole, the evidence in the record demonstrates that the Virginia access scheme is based, at least in part, on improper factors which are unrelated to the interest of public safety. This flaw alone invalidates the scheme. *See Larson,* 647

F.Supp. at 1492–93. For this reason, and the fact the 1985 study is too general to apply to single pup trailers, the Court finds that the evidence proffered by the defendant is inadequate to justify the scheme of access restrictions imposed on single pup trailers. Therefore, the Court must conclude that, because the Virginia restrictions are not "based on safety considerations" within the meaning of 49 U.S.C. § 2312(b), they conflict with federal law and are thus preempted.

### B. *Reasonableness of The Restrictions and Resulting Access*

Federal law requires that single 102″ wide pup trailers must have *reasonable access* to local points of loading and unloading, as well as to terminals, and facilities for food, fuel, repairs, and rest. It also commands that in regulating such access the state may employ only *reasonable restrictions.* 49 U.S.C. § 2312.

As noted earlier, Va.Code § 46.1–328.1 omits the portion of § 2312(a) which grants single pup trailers access to "points of loading and unloading." Instead, Va.Code § 46.1–328.1 speaks of such access only for carriers of household goods. The defendant responds that any facial inconsistency between Virginia § 46.1–328.1 and 49 U.S.C. § 2312(a) is cured by the resolution adopted on March 15, 1984 by the Commonwealth Transportation Commission (Deft's Ex. D). That resolution provided that all STAA vehicles have restricted access not only to terminals (as mentioned in the statute), but also to "points of origin and destination." The defendant argues that this language in the resolution includes the necessary points of loading and unloading, thereby eliminating any apparent conflict

---

**3.** Moreover, Congress's own findings about the safety of single pups contradict the conclusions which Virginia would draw from the 1985 "Impact Analysis." In reporting S.1402, the source of STAA's length and width provisions, the Senate Committee on Commerce, Science and Transportation observed that: "An increase in the width of trucks (from the traditional width of 96 inches) to 102 inches would not negatively impact safety. Buses are currently permitted under Federal law to operate at 102 inches on a nationwide basis. The operation of wider

trucks has been thoroughly studied by the Federal government in 1964, 1973, and as recently as 1979 with the conclusion that 102 inch wide vehicles are as safe as 96 inch wide vehicles." S.Rep.No. 298, 97th Cong., 1st Sess. 8 (1981). In addition, the Report to the TTSA stated that allowing local access for single pup trailers would provide "for safer and more efficient motor carrier operations in pickup and delivery service ..." S.Rep.No. 505, 98th Cong., 2d Sess., *reprinted in* 1984 U.S. Code Cong. & Ad. News 4769, at 4784.

between Virginia § 46.1–328.1 and the federal § 2312(a). Thus, reasons the defendant, this resolution alleviated any need for the General Assembly to amend its statute to include such access for single pup trailers.

Assuming *arguendo* that the Commission's resolution of March 15, 1984 has in fact cured any conflict between the federal and state statutes, ABF still contends that the Virginia scheme denies reasonable access for single pup trailers to local points of loading and unloading. ABF complains of the regulatory procedure which VDOT and the Commission have adopted and applied, and of the amount of access which has resulted in fact, arguing that the state's restrictions are not reasonable and do not allow the federally-mandated "reasonable access." The Court now considers these contentions.

### 1. *The Restrictions*

■ The prior review system which Virginia uses to designate access routes must be reasonable as applied to single pup trailers, or it is preempted. The state procedure of denying access for certain requested routes, pending review and approval of those requests, must be evaluated in light of the nature of the trucking industry and the local delivery and pick-up business. *Larson*, 647 F.Supp. at 1493–94. ABF contends that the *process* of applying for approval to use individual pup trailers over nondesignated routes is a cumbersome, time-consuming and inefficient procedure, because the customer points of loading and unloading vary daily and sometimes more often.

Indeed, the *Larson* court concluded that, given the nature of the freight delivery business and the use of single pup trailers for local service, such a system of prior review is almost always doomed to be unreasonable. While *Larson* involved a more egregious set of facts than are present here, much of what the court found and held there applies with equal force to the instant case.

The district court in *Larson* decided that the prior-review-and-approval system is unreasonable when applied to single pup trailers, because it effectively denies *all* access to customer points of loading and unloading. As the court reasoned:

> Points of loading and unloading, unlike locations of terminals, necessarily change with great frequency and are dependent upon the locations of the customers serviced by trucking companies. A carrier of general commodity freight, such as Consolidated, transports small shipments of freight for many different customers. This type of carrier serves small and large shippers, manufacturing locations, commercial establishments (e.g. pharmacy and office supply stores), schools, hospitals, and even private residences. There is often little or no advance notice as to a customer's location, and pick-up and delivery locations change daily ...
>
> In these circumstances, the reasonableness of prior review as an exercise of police power is greatly reduced, especially where a carrier seeks to use single twins for its pick-up and delivery operations. Congress itself recognized that the interests of safety were better served by allowing pick-ups and deliveries to be made in single twins rather than in full semis [quote and citation omitted].

*Consolidated Freightways v. Larson*, 647 F.Supp. at 1494. The same factual circumstances are present in the instant case and have been proven on the record (*see* Affs. of D. Fralin, J. Yarbrough; D. Fralin Depo. at 22–24, 34–39, 42–49). Under these circumstances, the *Larson* court concluded that:

> In view of the frequency of route changes for household goods carriers and operators of single twins, then, we find that it is *not* a reasonable exercise of the police power to require prior approval *of routes used by these vehicles.* Indeed, such a requirement would virtually mandate the use of non-STAA vehicles because of the frequency with which points of loading and unloading change, and would therefore effectively deny *all* [sic] access to points of loading and unloading for these vehicles, in serious violation of federal law.

*Larson,* 647 F.Supp. at 1494 (emphasis supplied).

The *Larson* court made clear that, under § 2312, a system of "prior review of access routes to and from points of loading and unloading" could never be a reasonable form of safety restriction for single pup trailers and household goods carriers. This conclusion may have been *dictum* in that case, since the court had previously noted that under Pennsylvania's informal policy, the single pup trailers could run freely over all the state's roads. *Larson,* 647 F.Supp. at 1485 n. 3, 1486, 1493. In any event, this Court agrees with that view and adopts it today in the case at bar. Given the conditions under which local deliveries and pickups must be made by the trucking industry, any system of prior review for local access is necessarily unreasonable and invalid when applied to single 102″ wide pup trailers. The Virginia access scheme entails such prior review and, for this reason as well, its regulations must fall.

### 2. *The Resulting Access*

█ Finally, ABF contends that Virginia's "blanket denial of access" to local points of loading and unloading violates the federal requirement that reasonable access be available. The evidence in the record showed that Virginia has nearly 55,000 miles of state and federal highways. Only 1,968 miles of these roads have been approved for STAA vehicles access. The state relies on evidence showing that 35,-500 miles of the state's highways have lane widths of nine feet or less, while some 23,000 miles of these have lane widths of *less than* nine feet. (Deft's Exs. 1–5; Ex. A at viii, 5–6, 28–57; Butner testimony, Tr. 16, 18–19.)

The state certainly has legitimate concern over the safety of 8 and ½ foot wide vehicles using roads with travel lanes of only nine feet or less, whether or not this fact alone would justify prohibiting access over all such roads. Still, this concern leaves a substantial number of highways unaccounted for, roughly 18,000 miles in all. On this basis, the Court must conclude that the Virginia scheme excludes too many miles of the state's roads without *sufficient* safety justifications. Such mass exclusion does not amount to reasonable access, because the single pup trailers are prevented from reaching the vast majority of their customer points of loading and unloading. It is common knowledge, and shown in the record, that most business customers are not located on major federal and state highways. In order to reach their customers, single pup trailers need access over more of the roads and streets which run throughout the Commonwealth.

The 1985 "Impact Analysis" and the testimony of Mr. Butner are simply insufficient to explain the wholesale exemption of most of the state's roads from access for single pup trailers. In order to produce the safety rationale required by federal law, Virginia must identify each stretch of highway to be excluded from access and give a specific safety reason for its particular exclusion. On the record in this case, the state has failed to provide such an explanation.

### CONCLUSION

The Court understands Virginia's concern for the safety of its citizens who must share these roads with the larger vehicles. The Court is also aware that a significant portion of the state's highways may prove to be properly "off limits" because unsafe for the wider single pup trailers. Still, in its current prohibition of access over most of the state's roads, Virginia has gone too far and denied reasonable access.

The specific choice of how next to proceed is for the state legislature to make, and not this Court. Indeed, in providing that states may impose "reasonable restrictions based on safety considerations," Congress has left to the states much room for creative legislation. Today, the Court holds only (1) that the Virginia access restrictions are not based solely on, nor adequately supported by, the safety analysis produced by defendant; (2) that the access restrictions do not provide the requisite "reasonable access" for single pup trailers; and (3) that the restrictions are unreasonable because they require prior route approval before single pup trailers are grant-

ed access to local points of loading and unloading. *See Larson*, 647 F.Supp. at 1494.

For all the foregoing reasons, Virginia's enforcement of Va.Code §§ 46.1–328(a)(3) and 46.1–328.1 against single pup trailer units conflicts with federal law and is, therefore, preempted. The defendant may not continue to enforce these statutes, or any regulatory policies adopted pursuant to them, in a manner that prevents single 102″ wide pup trailer units from reaching local customer points of loading and unloading.

An appropriate order shall issue declaring the relief granted to ABF by this Opinion.