GUNDRUM, J.
*181 ¶1 Town of Delafield appeals from the circuit court's dismissal of a citation issued to Central Transport Kriewaldt for operating a semi-truck on a Town road in excess of the Town's posted, seasonal weight restriction.
*425 Although the circuit court acknowledged there was no dispute the truck exceeded the weight limit, the court dismissed the citation on the basis that the restriction was preempted by federal law. We reverse and remand.
Background
¶2 On Friday, March 4, 2016, the Town posted road signs identifying its seasonal weight restriction prohibiting vehicles over six tons from driving on designated roads. Three days later, a Central Transport driver delivering art supplies to a Town resident drove a semi-truck in excess of six tons on one of the designated roads. The truck got stuck in a ditch, blocking traffic, and was eventually towed out by the Town's highway department. A sheriff's deputy issued Central Transport a citation for operating a vehicle on the road in excess of the posted weight limit, in violation of TOWN OF DELAFIELD , WIS. , ORDINANCE § 7.01 (2010), adopting WIS. STAT. § 348.17(1) (2017-18).[1]
*182 ¶3 Following a court trial, the circuit court granted Central Transport's motion to dismiss the citation on the basis that the seasonal weight restriction did not allow Central Transport reasonable access to its Town customer and thus was preempted by federal law, specifically 49 U.S.C. § 31114(a) (2018) of the Surface Transportation Assistance Act (STAA). The Town appeals.
Discussion
¶4 The circuit court granted Central Transport's motion to dismiss the citation in light of the facts the court found following the trial. When facts are derived from a trial to the court, we will not disturb the court's findings unless they are clearly erroneous. See WIS. STAT. § 805.17(2). Whether federal preemption applies, however, is a question of federal law we review de novo. Partenfelder v. Rohde , 2014 WI 80, ¶25, 356 Wis. 2d 492, 850 N.W.2d 896. Preemption occurs in three instances: (1) "when Congress expressly sets forth a law's preemptive effect," (2) "when there is a reasonable inference that the subject matter of the law in question is in a field in which Congress intended federal law to have exclusive application," and (3) "when state law conflicts with federal law." Id. , ¶26. Here, the parties focus on the third instance-whether WIS. STAT. § 348.17(1) and TOWN OF DELAFIELD , WIS. , ORDINANCE § 7.01, as applied, conflict with federal law-so we will as well. The interpretation and application of federal law to a set of facts is a question of law we review independently. City of Weyauwega v. Wisconsin Cent., Ltd. , 2018 WI App 65, ¶¶10-11, 384 Wis. 2d 382, 919 N.W.2d 609.
*183 ¶5 Central Transport does not dispute that it violated the Town ordinance, which adopted WIS. STAT. § 348.17(1). Section 348.17(1) provides:
No person ... shall operate a vehicle in violation of special weight limitations imposed by state or local authorities on particular highways, highway structures or portions of highways when signs have been erected as required by [ WIS. STAT. §] 349.16(2) giving notice of such weight limitations, except when the vehicle is being operated under a permit expressly authorizing such weight limitations to be exceeded....
Central Transport states that "[o]n its face" § 348.17(1) "does not contradict" the STAA, specifically 49 U.S.C. § 31114(a), or the related Federal Highway Administration (FHWA) regulation *426 23 C.F.R. § 658.19 (2018). It asserts, however, that a conflict arose in this case because the federal provisions "protect Central Transport's reasonable access to a terminal/delivery address," but the Town's application of § 348.17(1) through its weight restriction "denied Central Transport all access from the interstate to its terminal."[2] (Emphasis added.) The record indicates otherwise.
¶6 Section 31114(a) of Title 49 of the United States Code provides: "Prohibition on denying access. A State may not enact or enforce a law denying to a commercial motor vehicle subject to this subchapter or subchapter 1 of this chapter reasonable access " between *184 the Interstate and a terminal. (Emphasis added.) Similarly, § 658.19 of Title 23 of the Code of Federal Regulations provides in relevant part: "No State may enact or enforce any law denying reasonable access to vehicles with dimensions authorized by the STAA between the [Interstate] and terminals." (Emphasis added.) Congress did not define "reasonable access." As one court has observed, "[d]espite their awareness that the resulting 'nonuniformity of access has become a considerable burden for trucking companies,' Congress did nothing to change the reasonable access provisions of the law to provide for a uniform, national definition of reasonable access." Consolidated Freightways Corp. v. Larson , 647 F. Supp. 1479, 1483-84 (M.D. Pa. 1986) (citation omitted). We reverse and remand because we conclude that the manner in which the Town applied WIS. STAT. § 348.17(1) and Town ordinance § 7.01 afforded Central Transport "reasonable access" and thus is not preempted by the STAA or the FHWA regulation.
¶7 At the trial on Central Transport's citation, the Town's highway superintendent testified that the six-ton weight limit is only in place on certain Town roads "for a short amount of time" during the "spring thaw," in order to limit heavy vehicles on the roads when the roads are "very vulnerable" to damage from the weight "because all the ground is not thawed so the roads are soft." The superintendent personally determines when the weight restriction should be posted and later removed, which determinations are based upon his direct examination of the roads, including "movement" he observes and "frost coming out of the grounds and cracks." Once the roads are settled, he "pull[s] the weight limits." He testified that he utilized this process in March 2016, the time relevant to the *185 citation issued to Central Transport, and that at that time, the weight restriction was only posted and in effect between March 4 and March 11.
¶8 The superintendent acknowledged that the seasonal weight restriction would not necessarily be in effect during the same dates each year, but stated that it is common for companies to contact him around the time the restriction goes into effect. When asked what a company is supposed to do if it needs to make a delivery with a truck exceeding six tons during the time the weight restriction is in place, the superintendent responded:
What they typically do at the Town they call in and the driver or the company comes into my office and I issue them ... a temporary permit to drive on the Town road and I give them a route that they have to travel so they're not traveling *427 on unnecessary roads ... to get to ... where they have to go.
He confirmed that to the best of his knowledge, in the twenty-one years he had been employed with the Town, fifteen as superintendent, the Town had never denied access to anyone who needed an exception to the seasonal weight restriction.
¶9 The superintendent testified that in addition to the posted weight-restriction signs along designated roads, the weight restriction is also noted on the Town website, which provides his phone number and informs the reader to contact him if an exception to the restriction is needed. He confirmed that the restriction was posted on the website in March 2016, including "the language about obtaining a permit" and contacting him.
¶10 The sheriff's deputy who cited the Central Transport driver also testified to his awareness of the *186 Town policy of issuing permits to allow exceptions to the weight restriction and indicated that companies routinely contact the sheriff's department to inquire about such local restrictions. Central Transport called no witnesses at trial.
¶11 No evidence was presented indicating any carrier had ever been precluded from reaching its destination within the Town based upon how the Town executes the seasonal weight restriction and permit exception. Indeed, the testimony of the superintendent strongly suggests that no carrier has ever been denied access between the Interstate and a destination within the Town. As the circuit court found, the Town's weight restriction is in place for an "undetermined" but "short" period of time each year during the "spring thaw." In this case, the restriction was in place for one week, and the evidence indicates that even during that week, Central Transport could have secured a permit that would have allowed it to travel on weight-restricted roads with, at most, minimal inconvenience, i.e., having to take a specific, Town-designated route to its customer in order to minimize road damage.[3] Cf.
*187 Aux Sable Liquid Prods. v. Murphy , 526 F.3d 1028, 1036 (7th Cir. 2008) (expressing that the "broad language" of "reasonable access" reflects "a recognition on Congress's part that the manner and degree of access to and from the Interstate ... will vary across the country depending on factors such as whether the Interstate is cutting across rural or metro areas, traffic density on the road, and other considerations " and referring approvingly to the New Hampshire Motor Transport Association v. Town of Plaistow , 67 F.3d 326, 330 (1st Cir. 1995), court's statement that state and local governments have discretion under the "reasonable access" standard of 49 U.S.C. § 31114(a) to impose "a restriction that routed heavy traffic on a detour of a few miles to assure quiet in a hospital zone." (emphasis added)).
¶12 Central Transport complains that it was denied reasonable access between the Interstate and its customer in part because *428 the Town failed to provide it "or any company in the transportation industry" with information on how to secure a permit. The evidence from trial indicates that in order to avoid a citation, Central Transport would have had to have made itself aware of the weight restriction and permit-exception option the Town had in place at the time. During argument following the trial, the circuit court seemed to express on this point that this is simply a "[c]ost of doing business." We agree with this observation, in that it would appear to be a reasonably expected and normal part of a trucking company's business operation[4] to make itself aware of the rules of the road in the area in which it intends to make a delivery, just as it must consider the most efficient route of travel and order for delivering products, traffic congestion, weather, and overpass heights, among other things. *188 ¶13 No evidence was presented in this case suggesting it would be unreasonably burdensome for a trucking company such as Central Transport to develop an awareness of the Town's seasonal weight restriction. Indeed, the undisputed evidence indicates that had Central Transport merely checked the Town's website around the time of its scheduled delivery and/or contacted the Town directly, it could have easily procured a permit allowing it to legally and timely deliver the art supplies to its Town customer. We agree with the circuit court's additional expression that it "doesn't seem unreasonable" to expect a carrier sending a semi-truck to a residential area to inquire of the Town as to whether there are any laws that might affect its delivery.
¶14 On appeal, Central Transport relies most heavily upon the cases of Aux Sable and A.B.F. Freight System, Inc. v. Suthard , 681 F. Supp. 334 (E.D. Va. 1988). These cases do not carry the day for Central Transport.
¶15 In Aux Sable , Ridgeland Avenue and Steger Road were the only two routes by which trucks could get to and from the Interstate and a propane loading terminal. Aux Sable , 526 F.3d at 1031-32, 1037. Unloaded propane trucks weighed approximately 39,000 pounds, and fully loaded trucks could weigh up to 80,000 pounds. Id. at 1031. The county in which Steger Road lay had in place a restriction precluding trucks on that road unless the particular truck received a permit for each trip. Id. Because of the heavy weight of fully loaded propane trucks, the county refused to issue permits for such trucks to travel on Steger Road. Id. at 1037.
¶16 Due to road damage from trucks leaving the terminal via Ridgeland Avenue, which road lay in a different county, a township highway commissioner *189 subsequently implemented a 28,000 pound weight limit for trucks on that road. Id. at 1031-32, 1037. The terminal owner sued the township, claiming that this new weight restriction on Ridgeland Avenue was preempted by 49 U.S.C. § 31114 because with the preexisting weight restriction on Steger Road, the new restriction on Ridgeland Avenue resulted in a denial of "all access" to the Interstate for fully loaded propane trucks departing from the terminal. Aux Sable , 526 F.3d at 1032, 1035. The Aux Sable court agreed, adding that "[u]nder any calculus, the denial of all access cannot constitute reasonable access." Id. at 1037.
¶17 Significantly, the Aux Sable court indicated that the Ridgeland Avenue restriction would not have violated the reasonable-access requirement of 49 U.S.C. § 31114(a) if the Steger Road restriction had not been in place because without that *429 restriction, Steger Road would have afforded fully loaded propane trucks "another means" of accessing the Interstate. Aux Sable , 526 F.3d at 1037. The court stated: "The STAA, after all, does not prohibit states from denying any form of access to and from the Interstate, but rather, preemption only occurs when reasonable access is denied." Id.
¶18 In the case now before us, the evidence from trial demonstrates that carriers with trucks over six tons have "another means" by which such trucks can lawfully gain access between the Interstate and Town destinations during the limited but undisputedly sensitive time the weight restriction is in effect each spring-a simple, routinely-used permit system. No evidence was presented that any carrier who attempted to gain access through the permit system had ever been denied such access or encountered such a cumbersome, complex, or time-consuming process that it effectively precluded the carrier from gaining timely access. Far *190 from a "denial of all access," as occurred for fully loaded trucks in Aux Sable and as Central Transport alleges here, the Town appears to permit all access, albeit after working with the carrier to ensure it utilizes a route that limits damage to Town roads during the spring thaw.
¶19 The other case relied on by Central Transport, A.B.F. , is easily distinguished from the case now before us. In A.B.F. , the state of Virginia had a permanent prohibition on travel by certain trucks unless the particular roads on which they traveled had been approved for such trucks through a cumbersome and time-consuming state process. A.B.F. , 681 F. Supp. at 344. New roads could be added to the list of roads where access was allowed, but this required the trucking industry to make a request, the state's department of transportation "Highway and Traffic Safety Division ... 'to determine if the route [could] safely accommodate the larger vehicles,' " and then the Commonwealth Transportation Commission to consider the route. Id. at 340. A.B.F.'s customer points of loading and unloading varied daily (sometimes with only a few hours notice) and the state process for adding truck access to new roads would not allow sufficient opportunity for deliveries to be timely made in the competitive trucking industry. Id. at 336, 344. In addition to the challenging process, only sixty percent of all requests for new road access had been approved. Id. at 340.
¶20 Unlike the year-round restrictions in A.B.F. , id. at 339, the Town's weight restriction here is only in place for a short period of time during the annual spring thaw. In addition, the record in this case shows a much simpler and timely process for procuring access to restricted roads than the process in A.B.F. , and there was no evidence presented here that Central Transport *191 could not timely service customers in the Town due to the Town's restriction and permitting process. Furthermore, unlike the approval rate of only sixty percent for new-road-access requests in A.B.F. , here, the superintendent testified he was not aware of anyone ever being denied a permit for access to a Town destination.
¶21 The plain language of 49 U.S.C. § 31114(a) clearly demonstrates Congress allowed for state and local laws that may restrict a commercial motor vehicle's access between the Interstate and a terminal/delivery address, but required that such laws allow "reasonable access." The record in this case indicates that commercial motor vehicles in excess of six tons have unfettered access to all Town destinations almost the entire year and even during the brief spring-thaw period of restriction still have access, so long as they *430 secure a permit from the Town-which permits appear to be fairly easy to procure and to have never been denied to any carrier-and follow the Town's preferred route of travel. Furthermore, the inherent requirement that a carrier make itself aware as to whether a government restriction, such as a weight limit, might affect its delivery is not an unreasonable "cost of doing business." For these reasons, we conclude the Town's application of WIS. STAT. § 348.17(1) and TOWN OF DELAFIELD , WIS. , ORDINANCE § 7.01 through its seasonal weight-restriction and permit process did not deny Central Transport reasonable access between the Interstate and its Town customer and, therefore, did not conflict with § 31114.[5] Accordingly, because Central Transport made *192 no attempt to secure a permit and undisputedly violated the six-ton weight limit, the court erred in dismissing the citation.
By the Court. -Judgment reversed and cause remanded.

All references to the Wisconsin Statutes are to the 2017-18 version unless otherwise noted.

A "terminal" "means, at a minimum, any location where: Freight either originates, terminates, or is handled in the transportation process; or Commercial motor carriers maintain operating facilities." 23 C.F.R. § 658.5 (2018). Because the Town develops no argument challenging Central Transports' position that the residence where the art supplies were to be delivered constitutes a "terminal," we assume, without deciding, that it does.

The Wisconsin Towns Association asserts in an amicus brief:
Local governments are in the best position to know which routes can bear the most weight and have been designed for the heaviest traffic. Consequently, permitting procedures allow local governments the opportunity to use this information to make informed, well-reasoned, decisions about how best to accommodate an exemption request while limiting potential road damage.
....
Overweight permits allow municipalities to protect their roads while at the same time allowing overweight vehicles access to their desired destinations throughout the restricted period with minimal or no disruption to the operator's delivery schedule.

Central Transport has identified itself as an "international commercial carrier."

At one point in its briefing, Central Transport asserts that the STAA "expressly preempts" Wis. Stat. § 348.17 and the Town ordinance "[b]ecause the Town's weight restriction was imposed to prevent road damage, [and thus] it does not fall within the safety-concern exception found in [42 U.S.C.] § 31114(b) of the STAA." We do not address this issue because in the four sentences Central Transport devotes to it, Central Transport fails to sufficiently develop an argument that § 31114 limits acceptable restrictions to only those based solely on safety concerns. See Clean Wis., Inc. v. PSC , 2005 WI 93, ¶180 n.40, 282 Wis. 2d 250, 700 N.W.2d 768 ("We will not address undeveloped arguments."). That said, we note that Central Transport's position has been rejected by various courts. See , e.g. , Aux Sable Liquid Prods. v. Murphy , 526 F.3d 1028, 1036 n.4 (7th Cir. 2008) ("[A] more proper reading of § 31114(a) is that states may exercise their police powers for any number of reasons, so long as reasonable access is provided."); New Hampshire Motor Transp. Ass'n v. Town of Plaistow , 67 F.3d 326, 330-31 (1st Cir. 1995) ; Garza v. City of La Porte , 160 F. Supp. 3d 986, 1000-01 (S.D. Tex. 2016).